**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

ESTATE OF ABDIEL SARABIA HERNANDEZ, et al.,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.: 24-cv-00032-DMS-DEB

**ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) DENYING DAUBERT MOTIONS WITHOUT PREJUDICE**

[ECF Nos. 93, 95, 98.]

Following the death of Abdiel Sarabia Hernandez ("Sarabia") in the custody of the County of San Diego (the "County"), his estate, his wife, and his four minor children ("Plaintiffs") filed suit against the County and several of its jail employees ("Defendants").[1] Pending before the Court is Defendants' Motion for Summary Judgment. (ECF No. 98; Defs.' Mem. Supp. Mot. Summ. J. ("MSJ"), ECF No. 98-1.) Plaintiffs filed an opposition (Pls.' Opp'n Mot. Summ. J. ("Opp'n"), ECF No. 103), and Defendants filed a reply (Defs.' Reply Supp. Mot. Summ. J. ("Reply"), ECF No. 106). Defendants also move to exclude the opinions of two of Plaintiffs' experts: correctional-nursing expert

[1] The First Amended Complaint names the County and seventeen individual jail employees. (First Am. Compl. ("FAC") 12, ECF No. 40.) Six of those deputies, Bernal, Corona, Frisbie, Renick, Southwick, and Vo, have since been dismissed. (Order Granting Joint Mot. to Dismiss, ECF No. 89.) Plaintiffs now agree that Deputy Rodriguez should also be dismissed. (Opp'n 46.)

Johnnie Lambert, (ECF No. 93), and jail-practices expert Gary Raney, (ECF No. 95) (together, the "Motions to Exclude"). For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**, and the Motions to Exclude are **DENIED without prejudice**.

## I. BACKGROUND

Sarabia was booked into County custody as a pretrial detainee on May 24, 2021. (MSJ 2.) In January 2022, he was moved to the George Bailey Detention Facility (the "Facility"). (Defs.' Resp. Pls.' Add'l Facts ("PAF") No. 4, ECF No. 106-1.) There, he was housed in an upstairs dormitory (the "Dorm") that at the time held thirty-four inmates in twelve sets of triple bunks. (Pls.' Ex. 20, CLERB Report ("CLERB Rpt.") 3–4, ECF No. 103-24.)[2]

### A. The Knuckle Check

At about 9:45 p.m. on July 21, 2022, several deputies, including Herrera, Zelt,[3] and Romanos, entered Sarabia's dorm to investigate a fight among other inmates and conducted an investigation to identify the inmates involved (the "Knuckle Check"). (PAF No. 16.) Sergio Gonzalez, another detainee housed in the Dorm, testified that Sarabia was asleep when the deputies arrived for the investigation and that, once awoken, he appeared "dizzy, like, holding himself with his bed," and was "trying to breathe." (Pls.' Ex. 9, Gonzalez

---

[2] Defendants object to the County's Citizens' Law Enforcement Review Board ("CLERB") Report as irrelevant, hearsay, and unauthenticated. (PAF No. 47.) The Court relies on the report only for factual information drawn from Sheriff's Department records, such as the layout of the Dorm and Sarabia's condition when he was found, and not for the board's findings that any deputy violated policy. So limited, the report is not offered to prove culpable conduct and some of its contents could be presented in admissible form at trial, see Fed. R. Evid. 803(8)(A)(iii); *Montiel v. City of Los Angeles*, 2 F.3d 335, 341 (9th Cir. 1993); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

[3] Defendants note that Gonzalez identified the lieutenant as "Wilt." (MSJ 4.) But it is undisputed that Zelt went up to the Dorm during the investigation, (PAF No. 17), and he was the only lieutenant on shift, (Pls.' Ex. 22, ECF No. 103-26). A reasonable jury could find that Gonzalez simply misremembered the name. In any event, Zelt admits that during the Knuckle Check, he heard an inmate say Sarabia was not feeling well and that he or other deputies ordered Sarabia back to his bunk. (Defs.' Ex. V, Zelt Dep. ("Zelt Dep.") 19:3–20:5, ECF No. 98-26; Defs.' Ex. Z, Zelt Resp. Pls.' Interrogs. ("Zelt Interrog. Resp.") Nos. 6, 9, ECF No. 98-30.)

Dep. ("Gonzalez Dep.") 25, 119, ECF No. 103-13; *see* Defs.' Ex. AJ, Vare Rpt. ("Vare Rpt.") 29 n.32, ECF No. 98-40.) Gonzalez also testified that upon waking up, Sarabia told the officer: "I don't feel good, I need to go to the restroom." (*Id.* 25–26.) Gonzalez also "told the officer multiple times" that "[h]e don't feel good. You guys need to take him to medical." (*Id.* 26.) In response, deputy Herrera said: "Shut the fuck up. Get back in your rack. Put your face down." (*Id.* 27.) According to Gonzalez, Sarabia was "yelling" to the deputies, "I need to go to medical. I don't feel good." (*Id.* 40–41.)[4] Gonzalez stood up several times to tell the deputies that Sarabia needed medical care but "got yelled at multiple times" in response. (*Id.* 41–42.)

According to Defendant Zelt, an inmate said Sarabia was "not feeling well," and "more than one deputy, perhaps including [Zelt]," told Sarabia "something to the extent of 'go back to your rack.'" (Zelt Interrog. Resp. Nos. 6, 9; Zelt Dep. 19:3–20:5.) Herrera never checked on Sarabia or asked anyone else to, and Zelt does not remember anyone summoning medical care. (PAF Nos. 22–23.) Although deputies' "common practice" was not to allow inmates to use the restroom during an investigation, (Defs.' Ex. X ¶ 8, ECF No. 98-28), a deputy escorted Sarabia to the restroom around 10:02 p.m. (PAF No. 24.) At his deposition, Herrera identified that deputy on video as Deputy Romanos. (Defs.' Ex. U 85–86, ECF No. 98-25.) From his bunk, Gonzalez heard Sarabia coughing in the bathroom and telling the deputy, "I don't feel good. I need to go to medical." (Gonzalez Dep. 32, 50.) Plaintiffs contend that video shows Sarabia vomiting in the restroom around

---

[4] Defendants' repeated hearsay objections to Gonzalez's testimony regarding his and Sarabia's requests for medical attention, (PAF Nos. 18–21, 25, 28), are overruled. The statements are not offered for their truth but rather to demonstrate that the defendants were on notice of Sarabia's condition. *See Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."). Sarabia's statements that he did not feel good are also admissible for their truth as statements of his then-existing physical condition. Fed. R. Evid. 803(3). Herrera's statements are admissible against him as statements of a party opponent. Fed. R. Evid. 801(d)(2)(A). And Gonzalez's descriptions of what he saw and heard are not hearsay at all, and at summary judgment the question is whether evidence could be presented in admissible form at trial. Fed. R. Civ. P. 56(c)(2). Defendants' remaining point, that Gonzalez first described the yelling years after the fact, goes to credibility, which the Court does not weigh on summary judgment.

that time, and Defendants dispute that reading. (PAF No. 24.) Once Sarabia returned to his bunk, the deputy left without summoning any medical personnel. (PAF No. 29.)

B. **The Medication Pass**

At 10:41 p.m., Nurse Navarro and Deputies Toribio and Ramirez (the "Medication Pass Defendants") brought a medication cart to the foot of the stairs leading up to the Dorm to distribute medication to the detainees (the "Medication Pass"). (Defs.' Separate Statement ("DSS") Nos. 46–47, 57, ECF No. 106-1.) Navarro and Toribio are both licensed vocational nurses. (*Id.* Nos. 57, 62.) At 10:46 p.m., Sarabia walked from the bathroom across the Dorm to the stair platform and gestured down to Toribio. (DSS Nos. 49, 51–52.) None of the Medication Pass Defendants recall what Sarabia said. (PAF No. 32.) Sarabia then stepped back into the Dorm, where he stood with other inmates for more than four minutes. (DSS No. 72.) He never came down to the cart. (DSS Nos. 71–72.)

Navarro testified that Sarabia refused to sign the form because "[h]e did not come down the stairs," and she agreed that this "equates to a refusal to sign the form." (Defs.' Ex. AF, Navarro Dep. 133:8–18, ECF No. 98-36; *see* DSS No. 60.) The Sheriff's Department's medical refusal procedures (the "Refusal Policy") provide that a patient "who is refusing treatment will be counseled by medical staff of the risks and benefits of such action." (Defs.' Ex. AI 4, ECF No. 98-39.) For medications, the patient "shall sign a refusal form"; "[i]f the patient refuses to sign the refusal form, the nurse (if available) and deputy shall sign the form"; and the patient "should verbalize understanding of the above advice." (*Id.* 5.) At 11:17 p.m., Navarro completed a medication refusal form with the reason as "refused to come down to med window" and noting that the "[p]atient refused to sign this form."[5] (Defs.' Ex. AG 2, ECF No. 98-37.) Although Navarro noted that Sarabia refused his medications, Navarro did not attempt to contact or interact with Sarabia. (PAF No. 33.) Sarabia was last seen going to his bunk around 10:50 p.m., (*id.* No. 35), and Navarro left the housing unit at 11:13 p.m. (DSS Nos. 74–75.) Plaintiffs concede that

[5] Navarro did not speak with Sarabia; she recorded the refusal based on the deputies' account. (Pls.' Ex. 15, Navarro Dep. 166, ECF No. 103-19; PAF No. 33; MSJ 8, 27.)

Navarro, Toribio, and Ramirez did not know of Sarabia's condition or requests for medical care made during the Knuckle Check. (Opp'n 30.)

C. **The Safety Checks**

The Sheriff's Department's safety-check policy (the "Safety Check Policy") required sworn staff to check each inmate at least once every sixty minutes by direct visual observation, looking for obvious signs of medical distress, trauma, or criminal activity. (Pls.' Ex. 16 1, ECF No. 103-20; PAF No. 37.) In dormitory housing, the Safety Check Policy required staff to walk by each bunk in a way that allowed them to observe each inmate for such signs. (*Id.*) Between about 5:30 and 9:51 a.m. on July 22, 2022, deputies passed through the Dorm six times (the "Safety Checks"). (PAF Nos. 38–43; DSS Nos. 84–89, 91.) Garcia began a check at about 5:30 a.m. and spent twenty-nine seconds in the Dorm; Toribio and Ramirez at about 6:00 a.m. for twenty-seven seconds; LaBranche and Mazzola at 6:59 a.m. for thirty-nine seconds; Boorman at 7:58 a.m. for twenty-nine seconds; LaBranche at 8:59 a.m. for twenty-two seconds; and LaBranche and Mazzola at 9:51 a.m. for twenty-one seconds. (PAF Nos. 38–43; DSS Nos. 86, 88–89, 91.)[6] Defendants move for summary judgment on the safety-check claims only as to LaBranche, Mazzola, and Boorman (the "Safety Check Defendants"). (MSJ 28–30.)

Gonzalez testified that during safety checks at the Facility, "some officers do their job and the other officers just walk through and they don't even stop or check people." (Gonzalez Dep. 46.) Other inmates reported Sarabia showing signs of illness overnight and that morning. One saw him vomiting in the bathroom around midnight, (Vare Rpt. 28–29), another saw him vomiting between 6:00 and 7:00 a.m., (*id.* 27), and a third saw him go to the restroom at about 8:00 a.m. and heard him say he was feeling sick.[7] (*Id.* 28.)

---

[6] Defendants' area activity log attributes the 5:30 a.m. check to Romanos and Garcia and the 6:00 a.m. check to Romanos and Rodriguez. (DSS Nos. 84–85.) But Defendants do not dispute that Garcia began the 5:30 a.m. check and that Toribio and Ramirez began the 6:00 a.m. check. (PAF Nos. 38–39.)

[7] Although these accounts reach the record through Vare's summary of the detectives' interviews, the Court may consider them at this stage because the detainees could directly testify at trial to what they observed. *See Fraser*, 342 F.3d at 1036 ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

LaBranche, Mazzola, and Boorman testified either that they saw no signs of medical distress during the Safety Checks conducted that same morning or do not recall specific details. (Defs.' Ex. AL 8–9, ECF No. 98-42; Defs.' Ex. L 20–21, ECF No. 98-16; Defs.' Ex. M 12–13, ECF No. 98-17.) None of them summoned medical care for Sarabia. (Defs.' Ex. L 19.)

D. **Discovery and Cause of Death**

Sarabia was not discovered until about 10:12 a.m., when other inmates found him unresponsive. (PAF No. 45.) At that time, he was deceased and showing signs of rigor mortis. (*Id*. No. 46.) Responding deputies found him cold and stiff, and Mazzola told detectives that Sarabia was "blue." (*Id.*; Defs.' Ex. M 12–13; Pls.' Ex. 17, Corona Dep. 30:24–31:1, ECF No. 103-21.) Sarabia was found lying face down on his bunk with his hands under his head and a blanket pulled up to his shoulders. (Defs.' Ex. N 6, ECF No. 98-18; Vare Rpt. 28; Corona Dep. 31:15–18.) Deputy Corona testified that when he walked up to the bunk, he saw blood from Sarabia's nose on his face and arm. (Corona Dep. 30:24–31:23.)[8]

Plaintiffs' experts, forensic pathologist Dr. Howard Robin and emergency physician Dr. Alicia Minns, opine that Sarabia died of acute decompensated heart failure with pulmonary edema, a progressive condition that "is potentially reversible with prompt recognition and reasonable intervention." (Pls.' Ex. 11, Robin Rpt. ("Robin Rpt.") 4, ECF No. 103-15; Pls.' Ex. 10, Minns Rpt. ("Minns Rpt.") 3–4, ECF No. 103-14.) On their account, Sarabia had symptoms of heart failure "for at least the day prior to his death," and "[m]ore likely than not, these observable signs and symptoms were continuous" through his final twenty-four hours. (Minns Rpt. 4; Robin Rpt. 4.) Both opine that with timely hospital care, he would have survived "with a reasonable degree of medical certainty." (Minns Rpt. 5; *see* Robin Rpt. 4.) Defendants instead rely on the Medical Examiner's report, which concluded that Sarabia likely died of sudden cardiac arrest caused by

[8] The parties dispute whether the fluid was blood and whether Sarabia's face would have been visible to a deputy walking past the bunk. (PAF No. 44; DSS Nos. 96–97; Vare Rpt. 53.)

hypertensive cardiovascular disease, with morbid obesity and hypothyroidism contributing. (Defs.' Ex. E, Autopsy Rpt. 1, 3, ECF No. 98-9.) Defendants' experts likewise opine that he suffered a sudden cardiac death in which "the cardiac arrhythmia occurs without warning and without antecedent symptoms." (Defs.' Ex. A 6, ECF No. 98-5; *see* Defs.' Ex. AU ¶ 15, ECF No. 98-51.)

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.*; *see also Butler v. San Diego Dist. Att'y's Off.*, 370 F.3d 956, 958 (9th Cir. 2004) (stating if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own). "The district court may not weigh the evidence at the summary judgment stage but should focus on whether there are any triable issues of fact." *France v. Johnson*, 795 F.3d 1170, 1177 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). On a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (quoting *Adickes*, 398 U.S. at 157).

## III. ANALYSIS

### A. Deliberate Indifference

The Estate's first cause of action is a 42 U.S.C. § 1983 claim alleging that the individual Defendants violated Sarabia's right to adequate medical care under the Fourteenth Amendment's Due Process Clause. (FAC 12.) "Traditionally, the requirements for relief under [§] 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Defendants do not dispute that they acted under color of state law, so the questions are whether they violated Sarabia's constitutional rights and whether that violation caused his death.[9]

As to the first element, "[i]ndividuals in state custody have a constitutional right to adequate medical treatment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Because Sarabia was a

[9] Plaintiffs also assert safety-check claims against Garcia, who began the 5:30 a.m. check, and against Toribio and Ramirez, who began the 6:00 a.m. check. (Opp'n 34; PAF Nos. 38–39.) Defendants did not move for summary judgment on those claims and addressed them for the first time in their reply. (*See* MSJ 28–30; Reply 12–13.) The Court therefore does not reach them, and the claims against Garcia, Toribio, and Ramirez arising from those checks proceed. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything . . . ."). Plaintiffs do not, however, defend the claims against Garcia arising from the Knuckle Check. (*See* Opp'n 20–30.) They concede that Garcia "escorted the victim of the fight to medical and never went up and into the quad," and that he "has no memory of Sarabia making any statements regarding illness or medical attention that night." (DSS Nos. 33–34.) Summary judgment is therefore **GRANTED** as to Garcia on all claims arising from the Knuckle Check.

pretrial detainee, that right arises under the Due Process Clause of the Fourteenth Amendment. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)). Such claims are evaluated under an "objective deliberate indifference" standard. *Gordon v. Cnty. of Orange* (*Gordon I*), 888 F.3d 1118, 1124–25 (9th Cir. 2018). Under that standard, pretrial detainees must show:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.[10]

*Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125) (alteration in original).

**1. Knuckle Check Defendants**

Defendants have not shown that they are entitled to summary judgment on the deliberate indifference claim against Herrera, Zelt, and Romanos (the "Knuckle Check Defendants.") As to the first element, Defendants do not dispute that none of the three summoned medical care for Sarabia during the Knuckle Check, (PAF Nos. 22–23, 29), and a reasonable jury could find that to be an intentional decision. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (explaining that inaction satisfies the first element so long as the decision not to act was intentional rather than accidental).

---

[10] This element incorporates § 1983's causation requirement. *See Crumpton*, 947 F.2d at 1420; *Chaudhry v. Aragón*, 68 F.4th 1161, 1172 (9th Cir. 2023) (explaining that § 1983 plaintiffs "must demonstrate that [the defendant's] conduct was both the actual and proximate cause of their claimed deprivation").

As to the second element, a substantial risk of serious harm exists where the detainee has a "serious medical need," meaning that the "failure to treat [his] condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). A reasonable jury could find that the Knuckle Check Defendants' decisions put Sarabia at such a risk, as he died of heart complications hours later. *See Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) ("Russell's aortic dissection was indeed a 'serious' medical need, as it resulted in his death.").

As explained below, genuine disputes of material fact also exist on the third element, objective indifference, as to each Knuckle Check Defendant. *See infra* Section III.A.1.a.

Finally, a genuine dispute of material fact remains as to whether Herrera's, Zelt's, or Romanos's failure to summon medical care caused Sarabia's death. *See Chaudhry*, 68 F.4th at 1172 (explaining that § 1983 plaintiffs "must demonstrate that [the defendant's] conduct was both the actual and proximate cause of their claimed deprivation"). The evidence is sufficient to allow a reasonable jury to conclude that had Herrera, Zelt, or Romanos summoned care during the Knuckle Check, a medical professional would have identified Sarabia's signs of acute cardiac failure, (Minns Rpt. 4), and he could have received life-saving care. (Robin Rpt. 4.) Plaintiffs' experts opine that prompt evaluation and transport to a hospital would have allowed treatment of his heart failure, and that with that treatment he would, to a reasonable degree of medical certainty, have survived. (Robin Rpt. 5 ("The failure to provide timely medical assessment and emergency transport eliminated any opportunity for potentially life-saving intervention."); Minns Rpt. 5 ("Had Mr. Sarabia presented to a health care facility, he would have undergone . . . medical interventions that would have diagnosed and stabilized him, and with a reasonable degree of medical certainty, he would have survived.").)

**a. Objective Indifference**

"To satisfy the third element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but

less than subjective intent—something akin to reckless disregard.'" *Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125). This means "that the defendant disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (alteration and internal quotation marks omitted). "A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell*, 31 F.4th at 739.

**i. Herrera and Zelt**

Gonzalez testified that during the Knuckle Check, Sarabia looked "dizzy" and was "holding himself with his bed." (Gonzalez Dep. 25.) Gonzalez also testified that both he and Sarabia were pleading to get Sarabia medical attention:

> He was yelling it out to them. He was telling them, "Hey, I need to go to medical. I don't feel good." So I stood up, and I told them, "Hey, he needs to go to medical. He don't feel well." . . . I got yelled at multiple times because I was just trying to get attention for him. (Gonzalez Dep. 40–41.)

In response to these pleas for help, Herrera said: "Shut the fuck up. Get back in your rack. Put your face down. Put your hands out." (*Id.* 41.) In his interrogatory responses, Zelt acknowledged that "I do remember that one inmate, at the time Mr. Sarabia was returning or had returned to his bunk, said something to the extent of 'he's not feeling well'" and that "more than one deputy, perhaps including myself" instructed Sarabia "something to the extent of 'go back to your rack.'" (Zelt Interrog. Resp. Nos. 6, 9.)[11] Defendants maintain that Sarabia showed no signs of serious illness and that Zelt heard only a single comment that Sarabia was not feeling well. (MSJ 19–22; Reply 6–11.) But that conflict in the evidence is for the jury. It is undisputed that Herrera never checked on

[11] Defendants' hearsay objections to these statements are overruled for the reasons stated above. *See supra* note 4.

Sarabia or followed up on his requests for help, and Zelt does not remember anyone summoning medical care. (PAF Nos. 22–23.) This evidence would permit a reasonable jury to find that Herrera and Zelt each heard and failed to heed repeated pleas for medical care, whereas a reasonable officer in either's position would have appreciated the risk of leaving Sarabia untreated and taken appropriate measures to abate that risk.

**ii. Romanos**

The evidence also raises triable issues of material fact regarding Romanos's deliberate indifference. According to Gonzalez, during the Knuckle Check a deputy escorted Sarabia to the bathroom, where Gonzalez heard Sarabia coughing and telling the deputy, "I need to go to medical." (Gonzalez Dep. 32, 50.) Plaintiffs contend that video shows Sarabia vomiting in the restroom. (PAF No. 24.) At his deposition, Herrera identified a deputy leaving the module minutes later in the video footage as Romanos. (Defs.' Ex. U 85–86.) Romanos said he does not recall being present, (Defs.' Ex. X ¶¶ 5–7), but a lack of memory does not contradict Herrera's identification, and who escorted Sarabia is a question for the jury.

Defendants argue that vomiting is not a serious condition that would alert a reasonable officer to a substantial risk of harm. (MSJ 20–21; Reply 6.) But the question is not whether vomiting, standing alone, signals a serious medical need. Whether a reasonable officer would have appreciated the risk "turn[s] on the facts and circumstances of each particular case." *Gordon I*, 888 F.3d at 1125 (citation omitted). Gonzalez testified that when the deputy asked Sarabia if he was okay after vomiting, Sarabia said he did not feel good and needed to go to medical. (Gonzalez Dep. 32.) As the deputy walked Sarabia back to his bunk, Gonzalez also told him: "He needs to go to medical. He don't feel good." (Gonzalez Dep. 33.)[12] It is undisputed that the deputy then "left without summoning any

[12] Defendants argue that "[a] comment from Gonzalez, who lacked medical training or knowledge, that Sarabia 'needed medical attention'" was insufficient to cause a reasonable officer to appreciate the high risk of failing to treat Sarabia. (MSJ 21.) But *Gordon I* asks whether a reasonable officer in the circumstances would have appreciated the risk, not whether the person raising the alarm had medical training. *See Gordon I*, 888 F.3d at 1125. Defendants cite no authority suggesting a request for medical

medical personnel." (PAF No. 29.) At that point, a jury crediting Plaintiffs' evidence could find that the deputy had watched Sarabia vomit, (PAF No. 24), and had heard multiple pleas for medical help without alerting any medical staff. If a jury finds that the escorting deputy was Romanos, it could also find that Romanos, having escorted Sarabia to the restroom and heard repeated requests that he receive medical attention, failed to summon care even though a reasonable officer in his position would appreciate the risks of leaving Sarabia untreated.[13] *Cf. Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (finding that the officers' indifference to the prisoner's "obviously sickly appearance and his explicit statements" asking for care "could easily lead a jury to find that the officers consciously disregarded a serious risk to [his] health").

That Romanos escorted Sarabia to the bathroom does not compel a different conclusion. According to Defendants' own evidence, deputies ordinarily did not allow inmates to use the bathroom during an investigation. (Defs.' Ex. X ¶ 8.) A jury could infer that the deputy made an exception to that common practice because Sarabia's distress was obvious and concerning. And even if the escort reflected some attention to Sarabia's needs, it is up to a jury to decide whether a reasonable officer in Romanos's position would have done more than a bathroom escort to address Sarabia's symptoms. *See Sandoval*, 985 F.3d at 680 (explaining that prison officials aware that an inmate is suffering from a serious acute medical condition must respond with "reasonable diligence to treat the condition"). Nor did a reasonable officer need to perceive a risk of death before acting, (*see* MSJ 22); a serious medical need includes a condition that could result in "further significant injury or

---

help must come from a medical professional to warrant a response. Moreover, the request did not come from Gonzalez alone—Sarabia himself told the escorting deputy: "I don't feel good. I need to go to medical." (Gonzalez Dep. 32.)

[13] Defendants emphasize that Sarabia told other inmates he was "alright" after returning from the restroom. (MSJ 1, 5, 19, 21.) According to Gonzalez, when inmates asked Sarabia, "You all right?" he answered "yeah" but he also "said he felt sick." (Defs.' Ex. Q, Gonzalez Dep. 72:12–19, ECF No. 98-21.) The comment was made to Gonzalez, not to any Defendant, but even if a deputy overheard it, it does not entitle Defendants to judgment as a matter of law. A reasonable jury could find that, in the eyes of a reasonable officer, the remark would not obviate the need for medical attention.

the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (internal quotation marks omitted). Accordingly, the Motion for Summary Judgment on the deliberate indifference claim is **DENIED** as to Herrera, Zelt, and Romanos.

### 2. Medication Pass Defendants

As described above, during the Medication Pass Sarabia gestured down to Toribio from the top of the stairs, none of the Medication Pass Defendants recalls what he communicated, and Navarro and Ramirez later recorded that he had refused his medications. (*See supra* Section I.B; DSS Nos. 49, 51–52; PAF No. 32; MSJ 8.)

Although Plaintiffs describe Sarabia as visibly ill and "stagger[ing]" during the Medication Pass, (Opp'n 14, 31), they cite only the video for that description, and they concede that the video is hard to parse because "Sarabia appears on the video as a bulky mass of digital pixels." (*Id.* 31.) They provide no other evidence that would allow a jury to conclude that Sarabia was noticeably ill to Navarro, Toribio, or Ramirez. The Court's review of the footage, which is distant and difficult to make out, likewise reveals no obvious signs of illness. (Pls.' Ex. 27, 22:44:36–22:47:00; Defs.' Ex. AQ, 22:46–22:47.) Plaintiffs further concede that "the Med Pass defendants would not have known anything about Sarabia's request for medical attention" made earlier to Herrera, Zelt, and Romanos. (Opp'n 30.) Sarabia did not interact with Navarro or Ramirez, and he communicated with Toribio only from the top of the stairs. (DSS Nos. 49, 51–52.)

Nothing in the evidence indicates that a reasonable official in the position of Toribio, Navarro, or Ramirez would have noticed any obvious symptoms of a serious condition. *See Russell*, 31 F.4th at 739 (explaining that liability depends on whether a reasonable officer in the defendant's shoes would draw the inference that the plaintiff was at a substantial risk of serious harm). Nonetheless, Plaintiffs argue that because Sarabia was likely still symptomatic during the Medication Pass, a reasonable official in a Medication Pass Defendants' position would have appreciated the high degree of risk to Sarabia's health. (Opp'n 31–32.) But even assuming Sarabia remained symptomatic, nothing in the record shows that his symptoms were apparent to these Defendants. Plaintiffs' contention

that these Defendants could see that Sarabia "continued to show visible signs of medical distress," (*id.*), therefore rests on speculation, and "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

As to Navarro specifically, even assuming she should have spoken with Sarabia before recording his refusal, Plaintiffs have not shown that a reasonable official in her position would have appreciated an *obvious and high* degree of risk to Sarabia's health from failing to consult him about his medication refusal. Although "there is no § 1983 liability for simply acting contrary to prison policy," such policies can "underscore" that officials "had access to facts from which a reasonable person would infer that [a detainee] was at serious medical risk." *Russell*, 31 F.4th at 742. Navarro had no such facts. Her failure to follow the Refusal Policy was at most negligent and does not reflect the reckless disregard that deliberate indifference requires. *Cf. Sandoval*, 985 F.3d at 669, 679–80 (reversing summary judgment for a nurse who was told the detainee was "sweating, tired, and disoriented" yet "made essentially no effort to determine why [he] was suffering the symptoms"). Accordingly, the Motion for Summary Judgment on the deliberate indifference claim is **GRANTED** as to Navarro, Toribio, and Ramirez.

**3. Safety Check Defendants**

Pretrial detainees have "a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon v. Cnty. of Orange* (*Gordon II*), 6 F.4th 961, 973 (9th Cir. 2021). That right is part of the detainee's broader right to adequate medical care, and claims that it was violated are evaluated under the objective deliberate indifference standard. *See Gordon I*, 888 F.3d at 1124–25. Plaintiffs argue that the Safety Check Defendants failed to conduct adequate direct-view checks by walking past Sarabia's bunk area without stopping to look at him, leaving his medical distress undetected and thereby causing his death. (Opp'n 34–35.) A reasonable deputy, Plaintiffs contend, would have looked and recognized that Sarabia was in obvious distress, or, by the Final Check, dead, and called for help to save his life. (*Id.* 35–38.) The

Court addresses the Day-Shift Checks: the 6:59, 7:58, and 8:59 a.m. checks conducted by LaBranche, Mazzola, and Boorman, separately from the Final Check: the 9:51 a.m. check conducted by LaBranche and Mazzola.

The first element of deliberate indifference—an intentional choice regarding the detainee's conditions of confinement—is met for all Safety Check Defendants, as each chose how to monitor the Dorm. *See Castro*, 833 F.3d at 1070 ("[I]f the claim relates to inadequate monitoring of the cell, the inquiry would be whether the officer chose the monitoring practices rather than, for example, having just suffered an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell.").

As to the second element, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that the Safety Check Defendants' monitoring of the Dorm placed Sarabia at a substantial risk of suffering serious harm. In the medical-care context, this element is met where a detainee has a "serious medical need," such that failure to treat it "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Jett*, 439 F.3d at 1096. On Plaintiffs' evidence, Sarabia was suffering through the night with continuous symptoms of acute decompensated heart failure, a condition that, "left untreated," can, and here did, cause death. (Robin Rpt. 3–4; Minns Rpt. 4.) Safety Checks that did not detect that condition left Sarabia's serious medical need unaddressed, posing a substantial risk to his life.

**a. Objective Indifference: Day-Shift Checks**

The third element asks whether the defendant failed to take reasonable available measures to abate a risk to the detainee's health that a reasonable official in the circumstances would have appreciated, "making the consequences of the defendant's conduct obvious." *Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125). The defendant's conduct must amount to "something akin to reckless disregard." *Id*. Viewed in the light most favorable to Plaintiffs, the evidence before the Court creates triable issues of material fact as to whether a reasonable officer conducting a safety check would have recognized an obvious risk to Sarabia's health and acted to abate that risk by summoning

medical help.

The Safety Check Policy required deputies in dormitory housing to "walk by each bunk in a manner that permits them to observe each incarcerated person." (Pls.' Ex. 16 2.) Each Safety Check of the Dorm, which housed thirty-four detainees in twelve sets of triple bunks, lasted between twenty-one and thirty-nine seconds. (CLERB Rpt. 3–4; PAF Nos. 38–43.) From this evidence, a reasonable jury could infer that the checks were too short to adequately assess whether Sarabia's presentation demonstrated a need for medical treatment. *See Gordon II*, 6 F.4th at 973.[14]

Moreover, Plaintiffs' experts opine that Sarabia experienced "symptoms of acute congestive heart failure" including "difficulty breathing," "sudden nighttime wakening with restlessness," (Minns Rpt. 3–4), and "persistent coughing, restlessness, abnormal snoring, vomiting, and altered breathing patterns" the evening before his death. (Robin Rpt. 4.) Dr. Robin opines that "[m]ore likely than not, these observable signs and symptoms were continuous during these 24 hours, rather than intermittent . . . given the advanced pathology documented at autopsy and the progressive nature of acute cardiac failure with pulmonary edema." (*Id.*) Indeed, several detainees noted that Sarabia was symptomatic over the course of the night and into the early morning. One detainee, Nestor Perez, "saw Sarabia alive sometime between 6:00 a.m. and 7:00 a.m. on July 22, 2022, and said that Sarabia was in the bathroom vomiting." (Vare Rpt. 27.) That same morning, another detainee, Jose Garcia, "saw Sarabia go to the restroom at approximately 8:00 a.m. and return to his bed" before telling Garcia "that he was feeling sick and was going to lie down and rest." (*Id.* 28.) [15]

Sarabia was found at 10:12 a.m. with blood on his face.[16] (PAF No. 45; Corona Dep. 30:24–31:23.) Viewing the facts in the light most favorable to Plaintiffs, there is

[14] Defendants respond that no rule sets a minimum length for a check and that many detainees were in the dayroom during the later checks, (DSS No. 90; Reply 13), but those points go to the weight of the evidence, which the Court does not balance on summary judgment.
[15] *See supra* note 7.
[16] *See supra* note 8.

sufficient evidence to create a genuine dispute as to whether Sarabia was coughing, vomiting, breathing irregularly, or restless during the Day-Shift Checks. These facts create a triable issue as to whether a proper check would have revealed his condition to a reasonable officer conducting adequate direct view safety checks. It is up to a jury to resolve that dispute and determine whether a reasonable officer in Defendants' position would have (1) conducted the checks in a manner that put Sarabia and his presentation in direct view and (2) taken reasonable measures to abate the risk to his health. *See Gordon II*, 6 F.4th at 973 (holding that "pre-trial detainees do have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment"); *cf. Nyarecha v. Cnty. of Los Angeles*, No. 23-55773, 2024 WL 4511616, at *2 (9th Cir. Oct. 17, 2024) (reversing summary judgment for the county where the officers "consistently completed their checks of Nyarecha's seven-cell area in under twenty seconds, without breaking stride or pausing to look into the cells" and did not "attempt to elicit a response from Nyarecha or any other inmate").

**b. Causation**

**i. Day-Shift Checks**

The record also presents a genuine dispute as to whether the deficiencies Plaintiffs identify in the Day-Shift Checks caused Sarabia's death. Defendants' experts opine that Sarabia died of a sudden cardiac arrest that left no opportunity for treatment. (Defs.' Ex. A 6; Defs.' Ex. AU ¶ 15.) Plaintiffs' experts disagree. They opine that Sarabia died of acute decompensated heart failure, a progressive condition that "is potentially reversible with prompt recognition and reasonable intervention," and that with timely hospital care, "with a reasonable degree of medical certainty, he would have survived." (Robin Rpt. 4; Minns Rpt. 5.) A jury could also find that Sarabia was still alive during each of the three checks, as detainees reported seeing or hearing Sarabia between 6:00 and 7:00 a.m., at about 8:00 a.m., and at about 8:50 a.m., and Defendants' own expert concludes he was "likely" alive at 8:50 a.m. (Vare Rpt. 27–28, 72–73.) Based on these facts, a reasonable jury could find that each deputy's failure to recognize Sarabia's symptoms and take

reasonable measures to address them—during LaBranche and Mazzola's 6:59 a.m. count, Boorman's 7:58 a.m. check, and LaBranche's 8:59 a.m. check— caused his death. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1080 (9th Cir. 2013) ("'If reasonable persons could differ' on the question of causation then 'summary judgment is inappropriate . . . .'" (citation omitted)); *id.* at 1084 (finding a triable issue of causation because testimony allowed a jury to conclude that, had officers acted immediately, the inmate "might have survived"). Because genuine disputes of material fact exist on every element, the Motion for Summary Judgment on the deliberate indifference claim is **DENIED** as to LaBranche, Mazzola, and Boorman for the Day-Shift Checks.

**ii. Final Check**

Assuming without deciding that LaBranche and Mazzola were deliberately indifferent during the Final Check, Plaintiffs nonetheless fail to demonstrate a genuine dispute as to whether that deliberate indifference caused Sarabia's death. Plaintiffs concede, and Defendants do not contest, that Sarabia was already deceased during the 9:51 a.m. check. (Opp'n 17; PAF No. 44.) When Sarabia was found at 10:12 a.m., he was blue, cold to the touch, and showing signs of rigor mortis. (PAF Nos. 45–46; Defs.' Ex. M 12–13; Corona Dep. 30:24–31:23.) Plaintiffs rely on these findings to argue that Sarabia had been dead for some time before he was found. (*See* FAC ¶ 40.) Because Sarabia was already dead during the Final Check and showed signs of rigor mortis about twenty minutes later, no reasonable jury could find that any deficiency in that check caused his death. Accordingly, the Motion for Summary Judgment on the deliberate indifference claim is **GRANTED** as to LaBranche and Mazzola for the Final Check.[17]

**B. Familial Association**

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their

---

[17] Because no reasonable jury could find that the Final Check caused Sarabia's death, LaBranche and Mazzola are entitled to summary judgment on Plaintiffs' remaining claims to the extent they rest on the Final Check.

child or parent through official conduct." *Lemire*, 726 F.3d at 1075. And "only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "[A] prison official's deliberately indifferent conduct will generally 'shock the conscience' so as [sic] long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075. Because the familial association claim rests on the same conduct, it rises or falls with the underlying deliberate indifference claim. *See Schwarz ex rel. Parker v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation.") (citing *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004)).

Accordingly, Defendants' Motion for Summary Judgment on the familial association claim is **GRANTED** in part and **DENIED** in part. The motion is **DENIED** to the extent the claim rests on (1) the Knuckle Check, as to Herrera, Zelt, and Romanos; and (2) the Day-Shift Checks, as to LaBranche, Mazzola, and Boorman. The motion is **GRANTED** to the extent the claim rests on the Medication Pass, as to Navarro, Toribio, and Ramirez.

### C. Qualified Immunity

Defendants argue they are entitled to qualified immunity on Plaintiffs' deliberate indifference and familial association claims. (MSJ 31–35.) Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Government officials are entitled to qualified immunity unless the plaintiff can show that both (1) the public official violated a plaintiff's constitutionally protected right and (2) that right was clearly established at the time of the violation. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" and still "must view the

evidence in the light most favorable to the opposing party." *Tolan*, 572 U.S. at 656–57 (quoting *Adickes*, 398 U.S. at 157).

**1. Knuckle Check**

The constitutional right of pretrial detainees to adequate medical care is longstanding and clearly established under both Supreme Court and Ninth Circuit precedent. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (noting that the Due Process Clause "does require the responsible government or governmental agency to provide medical care" to those in pretrial custody and that their due process rights "are at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (denying qualified immunity where it was "clearly established that the officers could not intentionally deny or delay access to medical care").

When conducting a qualified immunity analysis, the clearly established law at issue "should not be defined 'at a high level of generality'" and "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640; *see Russell*, 31 F.4th at 737–38 ("It is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity.").

Indeed, the Ninth Circuit has, on several occasions, condemned as unconstitutional conduct similar to that of the Knuckle Check Defendants. For example, in *Lolli*, the court reversed summary judgment for officials who withheld food and insulin from a detainee who was "pleading 'My God, . . . I'm a diabetic, and all I needed was food'" because "[t]he urgency of his protestations . . . further supports the inference that the officers knew of the risk of harm [he] faced." 351 F.3d at 421–22. In *Sandoval*, the Ninth Circuit restated the

rule that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." 985 F.3d at 680. The court further reasoned that the right to medical treatment is not limited to life-threatening conditions, and that failing to provide meaningful treatment to a detainee in obvious distress is unconstitutional. *Id.*

Here, the evidence would permit a jury to find that the Knuckle Check Defendants refused to summon medical care despite repeated requests and visible signs of distress, conduct that violated a clearly established constitutional right. Accordingly, Herrera, Zelt, and Romanos are not entitled to qualified immunity.

**2. Medication Pass**

Because no reasonable jury could find that Navarro, Toribio, or Ramirez acted with deliberate indifference during the Medication Pass, Plaintiffs have not shown a constitutional violation, so those Defendants are entitled to qualified immunity on the federal claims arising from it. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ("Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.").

**3. Safety Check**

The Ninth Circuit has explicitly held that "pre-trial detainees do have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon II*, 6 F.4th at 973. After announcing that right, the court stated that "law enforcement and prison personnel should heed this warning because the recognition of this constitutional right will protect future detainees." *Id. Gordon II* was decided on July 26, 2021, almost a full year before the safety checks at issue. As explained above, the evidence raises genuine disputes of material fact regarding whether LaBranche, Mazzola, and Boorman failed to conduct constitutionally adequate direct-view safety checks of Sarabia, in contravention of a constitutional right that was clearly established at the time. Accordingly, LaBranche, Mazzola, and Boorman are not entitled

to qualified immunity for the Day-Shift Checks.

**D. Bane Act**

The Bane Act is a California statute that empowers individuals to sue anyone, including public officials or law enforcement officers, who interferes or attempts to interfere with their constitutional or statutory rights through threats, intimidation or coercion. Cal. Civ. Code § 52.1(b)–(c); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law . . . ." *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 791–92 (2017) (quoting *Simmons v. Superior Ct.*, 7 Cal. App. 5th 1113, 1125 (2016)). Violations of federal constitutional and statutory rights are all cognizable under the Bane Act. *See* Cal. Civ. Code § 52.1(b). "The elements of a Bane Act claim are *essentially identical* to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022).

To show specific intent, a plaintiff must satisfy two requirements. First, the right at issue must be "clearly delineated and plainly applicable under the circumstances of the case[.]" *Cornell*, 17 Cal. App. 5th at 803. Second, the defendant must have "commit[ted] the act in question with the particular purpose of depriving" the victim of his enjoyment of the interests protected by that right. *Id.* The specific intent requirement "is satisfied where the defendant . . . acted with '[r]eckless disregard of the right at issue.'" *Est. of Serna v. Cnty. of San Diego*, No. 20CV2096-LAB-MSB, 2022 WL 827123, at *8 (S.D. Cal. Mar. 18, 2022) (alteration in original). Moreover, "nothing in the text of the Bane Act requires that the coercion element be separate from the underlying constitutional or statutory violation." *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018).

Because genuine disputes of material fact exist as to whether Herrera, Zelt, Romanos, LaBranche, Mazzola, and Boorman acted with deliberate indifference during the Knuckle Check and the Day-Shift Checks, whether they acted with the requisite specific

intent is a question "properly reserved for the trier of fact." *Hughes*, 31 F.4th at 1224; *see Scalia*, 308 F. Supp. 3d at 1084 ("a prison official's deliberate indifference to serious medical needs is a coercive act that rises above mere negligence . . ."); *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) ("a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs in violation of his constitutional rights . . . adequately states a claim for relief under the Bane Act.").

Accordingly, the Motion for Summary Judgment on the Bane Act claim is **DENIED** as to Herrera, Zelt, Romanos, LaBranche, Mazzola, and Boorman. Because no reasonable jury could find that Navarro, Toribio, or Ramirez acted with deliberate indifference during the Medication Pass, the Bane Act claim lacks a predicate violation to that extent. *See Hughes*, 31 F.4th at 1224. The Motion for Summary Judgment on the Bane Act claim is therefore **GRANTED** as to Navarro, Toribio, and Ramirez to the extent it rests on the Medication Pass. Because the County is liable for its employees' acts within the scope of their employment to the same extent as the employees themselves, Cal. Gov't Code § 815.2(a), the Bane Act claim also survives against the County to the extent it survives against the individual Defendants.

**E. Failure to Summon Medical Care**

Under California Government Code § 845.6, a public employee, and the County through him, is liable if he (1) "knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 606 (9th Cir. 2019) (quoting *Jett*, 439 F.3d at 1099). If the employee did *not* know or have reason to know of the prisoner's need for medical care, neither the "public entity nor [the] public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody." Cal. Gov't Code § 845.6. The statute reaches both "actual or constructive knowledge" of the prisoner's need for immediate care. *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013) (citation omitted). For the reasons discussed

above, a reasonable jury could find that the Knuckle Check Defendants, who heard repeated requests that Sarabia be taken to medical, and the Safety Check Defendants, whose Day-Shift Checks a jury could find too cursory to detect Sarabia's condition, had reason to know that he needed immediate medical care. Accordingly, the Motion for Summary Judgment on this claim is **DENIED** as to Herrera, Zelt, Romanos, LaBranche, Mazzola, and Boorman.

As to Navarro, although the facts are insufficient to create a genuine dispute as to her reckless disregard under the deliberate indifference standard, her liability under § 845.6 is a far closer call. Plaintiffs concede that Navarro had no knowledge of Sarabia's earlier pleas for help or symptoms, (Opp'n 30), and in the video of the Medication Pass, Sarabia shows no obvious signs of illness. Yet the Refusal Policy required that Sarabia be counseled on the risks of refusing his medications regardless of how he presented, and Navarro did not attempt to contact or interact with him. (Defs.' Ex. AI 4–5; PAF No. 33.) Plaintiffs contend that Sarabia vomited minutes before the Medication Pass, (PAF No. 31); Defendants' own expert describes him as bent over the toilet at 10:44 p.m., (Vare Rpt. 35–36); and Dr. Robin opines that his symptoms were more likely than not continuous throughout the evening, (Robin Rpt. 4). On this record, a reasonable jury could find that had Navarro, the nurse responsible for the Medication Pass, counseled Sarabia as the Refusal Policy required, she would have observed his condition, and so she had reason to know that he needed immediate medical care. Accordingly, the Motion for Summary Judgment on this claim is **DENIED** as to Navarro. Toribio and Ramirez stand differently. The Refusal Policy assigns the follow-up on a medication refusal to the nurse: the refusal form "should be checked by the nurse," and "[t]he nurse should advise" the patient of the consequences of continued refusal. (Defs.' Ex. AI 4–5.) A deputy's role under the policy is to sign the refusal form, with the nurse if available, when the patient will not. (*Id.*) Navarro was the nurse conducting the Medication Pass. (DSS No. 46.) Toribio attended as a deputy, (*id.*), and although he is also a licensed vocational nurse, (*id.* No. 62), Plaintiffs point to no evidence that he, rather than Navarro, was responsible for counseling Sarabia.

His only contact with Sarabia was a brief exchange across the stairs, (*id.* Nos. 49, 51–52), and Plaintiffs identify nothing in that exchange that would have alerted him to a medical need. Ramirez's involvement was more limited still: he announced the Medication Pass and learned of the refusal from Toribio. (DSS Nos. 47, 54–55.) Nothing in the record indicates that he interacted with Sarabia, and Plaintiffs' opposition refers to him only in passing. (Opp'n 30–31, 41.) Nothing in the record shows that Toribio or Ramirez knew or had reason to know of Sarabia's condition. The Motion for Summary Judgment on this claim is therefore **GRANTED** as to Toribio and Ramirez. Because the County is liable under section 845.6 for its employees' failures to summon care, the claim also proceeds against the County to the extent it proceeds against the individual Defendants.

**F. Negligence**

Sarabia's estate also asserts a negligence claim against Herrera, Zelt, Romanos, Navarro, Toribio, Ramirez, Garcia, LaBranche, Mazzola, and Boorman. (FAC 19.) Plaintiffs allege that these Defendants breached a duty imposed by their special relationship as Sarabia's jailers "by failing to summon medical care, failing to perform a welfare check on Sarabia after he did not respond during the distribution of medication, and failing to conduct adequate safety checks of Sarabia during the hours leading up to his death." (FAC ¶ 82.) Defendants respond that they did not breach any duty or cause Sarabia's death. (MSJ 35–36.)

A negligence claim under California law requires (1) a duty of care, (2) breach of that duty, (3) causation, and (4) damages. *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009); *see also Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). Duty is a question of law for the court; breach and causation are ordinarily questions of fact. *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 772–73 (2011). Summary judgment on those elements is appropriate only if, "viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Hayes*, 57 Cal. 4th at 632.

Here, Defendants do not dispute that they owed Sarabia a duty of care, and California law recognizes a special relationship between a jailer and a prisoner that imposes a duty of

care towards the detainee. *See Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008) ("[T]he relationship between them is protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself . . . ."); *Frausto v. Dep't of Cal. Highway Patrol*, 53 Cal. App. 5th 973, 993 (2020) ("Once in custody, an arrestee is vulnerable, dependent, subject to the control of the officer and unable to attend to his or her own medical needs. Due to this special relationship, the officer owes a duty of reasonable care to the arrestee."). As such, each individual Defendant owed Sarabia a duty of reasonable care as a matter of law. Nor do Defendants dispute the damages element, except to challenge the availability of pre-death pain and suffering and punitive damages, which the Court addresses below. (*See* MSJ 35–36, 40.) In any event, Plaintiffs offer evidence from which a jury could infer that Sarabia suffered actual harm. *See supra* Sections I.A, I.D.

**1. Breach and Causation**

**a. Knuckle Check and Safety Check Defendants**

Because the Fourteenth Amendment standard requires "more than negligence," *Gordon I*, 888 F.3d at 1125, evidence sufficient to create a triable issue of objective deliberate indifference necessarily suffices to create a triable issue of breach under California negligence law. Similarly, the evidence that creates a triable issue of causation on the deliberate indifference claim creates a triable issue of causation here. Accordingly, the Motion for Summary Judgment on the negligence claim is **DENIED** as to Herrera, Zelt, Romanos, LaBranche, Mazzola, and Boorman.

**b. Medication Pass Defendants**

Plaintiffs concede that the Medication Pass Defendants were not told of Sarabia's earlier symptoms or requests for medical attention. (Opp'n 30.) They contend, however, that the Medication Pass Defendants breached their duty of reasonable care by failing to summon medical care for Sarabia despite his visible symptoms, and that Navarro further violated that duty when she failed to counsel Sarabia on the risks of refusing his medication as the Refusal Policy required. (Opp'n 41.)

**i. Toribio and Ramirez**

Plaintiffs identify no evidence that Toribio or Ramirez acted differently than a similarly situated reasonable deputy during the Medication Pass, and they concede that neither knew of Sarabia's earlier symptoms or requests for medical attention. (Opp'n 30.) And as discussed above, the video of the Medication Pass, though distant and difficult to make out, shows no obvious signs of illness, including during Sarabia's conversation with Toribio. (*See supra* Section III.A.2; Pls.' Ex. 27, 22:44:36–22:47:00; Defs.' Ex. AQ, 22:46–22:47.)

As to Toribio, Plaintiffs argue that he "had contact with Sarabia for several seconds, right after Sarabia had been vomiting" and from that the Court should infer that the symptoms were visible, and that a jury could find that the topic of their conversation was about Sarabia feeling ill. (Opp'n 32.) Plaintiffs fail to identify evidence that shows that Toribio knew or should have known that Sarabia was unwell based on a brief encounter from across the stairs, and thus fail to create a triable issue on Toribio's negligence. *See* Cal. Gov't Code § 845.6; *Castaneda*, 212 Cal. App. 4th at 1070 (explaining that the duty to provide medical care for prisoners is limited to instances "where there is actual or constructive knowledge that the prisoner is in need of immediate medical care" (quoting Cal. Law Revision Comm'n cmt.)); *Horton*, 915 F.3d at 606 (requiring that "the public employee knew or had reason to know of the need" for immediate medical care (citation omitted)). As to Ramirez, Plaintiffs cite no evidence in their opposition suggesting that he breached a duty to Sarabia, and he is mentioned only through group references without any particularized facts describing his involvement. (Opp'n 30–31, 41.) These assertions are insufficient to withstand summary judgment. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (a party "cannot rely on the mere possibility of a factual dispute . . . to avert summary judgment," nor "expect the district court to draw inferences favorable to it when they are wholly unsupported"). Accordingly, the Motion for Summary Judgment on the negligence claim is **GRANTED** as to Toribio and Ramirez to the extent it rests on the Medication Pass.

**ii. Navarro**

Plaintiffs argue that Navarro was negligent in failing to consult Sarabia after he refused his medications despite the Refusal Policy's requirement that she do so. (Opp'n 15, 31–32.) That Navarro is entitled to summary judgment on the deliberate indifference claim does not resolve her negligence liability, as deliberate indifference requires more. *See Gordon I*, 888 F.3d at 1125. Where deliberate indifference asks whether "a reasonable official in the circumstances would have appreciated the *high degree* of risk involved—making the consequences of the defendant's conduct *obvious*," *Gordon I*, 888 F.3d at 1125 (emphasis added), negligence asks what a reasonably careful licensed vocational nurse would have done under the circumstances. *See Alef v. Alta Bates Hosp.*, 5 Cal. App. 4th 208, 215 (1992) (medical providers must "exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances," and "a nurse's conduct . . . [is measured] by that of other nurses in the same or similar locality and under similar circumstances").

As discussed above, *see supra* Section III.F, Navarro owed Sarabia a duty of care. Even assuming Sarabia refused his medications,[18] the Refusal Policy required that he "be counseled by medical staff of the risks and benefits of such action" and that he "verbalize understanding of the above advice." (Defs.' Ex. AI 4–5.) Navarro did neither. It is undisputed that she did not attempt to contact or interact with Sarabia, and that she recorded his refusal based on the deputies' account. (PAF No. 33; MSJ 8, 27.) Defendants respond that Toribio communicated with Sarabia on Navarro's behalf, (PAF No. 33), but whether that satisfied the Refusal Policy and the standard of care is a question for the jury. That Navarro failed to comply with this policy is relevant to the question of breach, and a

---

[18] The parties dispute whether Sarabia refused his medications at all. Defendants contend that he communicated a refusal to Toribio from the platform, and that Navarro understood his failure to come down as a refusal. (DSS Nos. 53, 60.) Plaintiffs respond that no Medication Pass Defendant recalls what Sarabia said from the platform. (*Id.* No. 53.) The Court need not resolve this dispute because, even accepting Defendants' account, Navarro did not take the steps the Refusal Policy required.

reasonable jury could find that Navarro's conduct fell short of what a careful nurse in her position should have done. *See Minch v. Dep't of Cal. Highway Patrol*, 140 Cal. App. 4th 895, 898 (2006) (although an agency manual's "provisions do not establish a duty of care," "the manual would be admissible evidence on the question of breach of duty, if a duty of care existed"); *Hayes*, 57 Cal. 4th at 632 (noting that summary judgment on breach is appropriate only if, "viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence"). A reasonable jury could also find causation. Had Navarro counseled Sarabia as the Refusal Policy required, a jury could find that she would have observed the symptoms that Plaintiffs' experts opine were continuous, (Robin Rpt. 4), and summoned the care that they opine would have saved his life. (Minns Rpt. 5; Robin Rpt. 4–5.)

**iii. Immunity**

Defendants also argue that Navarro is immune under two provisions of the Government Code. (MSJ 38–40; Reply 13–15.) Neither applies. First, section 845.6 does not shield Navarro, a licensed nurse, from malpractice liability: "Nothing in this section exonerates a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state from liability for injury proximately caused by malpractice . . . ." Cal. Gov't Code § 845.6. Second, Defendants argue that section 855.6 immunizes Navarro's failure to examine Sarabia for heart failure.[19] (Reply 14–15.) Section 855.6

---

[19] Defendants also argue that the Knuckle Check and Safety Check Defendants are immune under this statute, on the ground that they "are not medical providers and they are not trained to diagnose," (MSJ 38–40). But because Plaintiffs' claims against those Defendants rest on their failure to summon medical care, not on any failure to examine, (*see* FAC ¶¶ 82, 95), the statute does not apply to them. *See Sowash v. Cnty. of San Mateo*, No. 25-CV-09630-MMC, 2026 WL 76697, at *6 (N.D. Cal. Jan. 9, 2026) (declining to extend § 855.6 immunity where the plaintiff's theory was not based on failure to conduct an examination but instead "based on the theory that, whatever the cause, [detainee] was clearly in distress and [defendants] failed to take appropriat[e] action"); *cf. Lum v. Cnty. of San Joaquin*, 756 F. Supp. 2d 1243, 1257 (E.D. Cal. 2010) ("While the immunity granted under this section is broad, it has been held that it does not extend to a situation where the defendant fails to provide medical care for a prisoner in obvious need of such care."). As to Toribio and Ramirez, the Court need not address either immunity statute because it grants the Motion for Summary Judgment on the merits of the negligence and section 845.6 claims arising from the Medication Pass.

provides:

> Except for an examination or diagnosis for the purpose of treatment, neither a public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination, of any person *for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or* others. Cal. Gov't Code § 855.6 (emphasis added).

Although immunity under § 855.6 is not limited to health care professionals and can apply to "any public employee," it is only available "so long as the examination in question meets the other requirements of section 855.6." *Cleveland v. Taft Union High Sch. Dist.*, 76 Cal. App. 5th 776, 803 (2022). Section 855.6 is narrow in two respects. First, it does not cover examinations for the purpose of treatment or diagnosis. Second, the immunity "relates only to the failure to make any examination or, if an examination is made, to the 'adequacy' of the examination"—it does not reach conduct other than an examination. *Collins v. Cnty. of San Diego*, 60 Cal. App. 5th 1035, 1059–60 (2021) (quoting Cal. Law Revision Comm'n cmt.); *cf. Cleveland*, 76 Cal. App. 5th at 810 (school employees' failures to communicate, coordinate, and monitor, "fell outside the immunity provided for mental examinations"). Navarro's alleged failures—to counsel Sarabia and to obtain his verbalized understanding—are not failures of examination at all. And to the extent Defendants recast them as a failure to examine Sarabia for heart failure, (Reply 14–15), any examination by the nurse responsible for his medications would have been for the purpose of treatment. Accordingly, the Motion for Summary Judgment on the negligence claim is **DENIED** as to Navarro.

**G. Wrongful Death**

Under California Code of Civil Procedure § 377.60, a decedent's surviving spouse and children may assert "[a] cause of action for the death of a person caused by the wrongful act or neglect of another." Cal. Civ. Proc. Code § 377.60. "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the

resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006) (emphasis omitted) (quoting 5 B.E. Witkin, *California Procedure*, *Pleading* § 891 (4th ed. 1997)). Here, Sarabia's wife and children base their wrongful death claim on three predicate wrongs: (1) failure to summon medical care under section 845.6, (2) negligence, and (3) deliberate indifference.[20] (FAC ¶ 78.) The claim therefore survives against each Defendant to the extent any predicate theory survives. And as discussed above, the evidence creates a genuine dispute as to whether Defendants' conduct caused Sarabia's death. Defendants do not contest Plaintiffs' wrongful death damages; they argue only that the underlying claims fail. (MSJ 37–38.)

**1. Knuckle Check Defendants**

Because the Motion for Summary Judgment is denied on all three theories as to Herrera, Zelt, and Romanos, the Motion for Summary Judgment on the wrongful death claim is also **DENIED** as to them.

**2. Medication Pass Defendants**

Because the Motion for Summary Judgment is granted as to Toribio and Ramirez on all three theories arising from the Medication Pass, the motion on the wrongful death claim is also **GRANTED** as to them to the extent it rests on the Medication Pass.[21] As to Navarro, the motion is **GRANTED** to the extent the claim rests on deliberate indifference and **DENIED** to the extent it rests on section 845.6 and negligence.

**3. Safety Check Defendants**

Finally, the Motion for Summary Judgment on the wrongful death claim is **DENIED** as to LaBranche, Mazzola, and Boorman because all three predicate theories survive as to

---

[20] "Plaintiffs seek their wrongful death damages against Defendant County of San Diego only as to the theory that the County's employees violated section 845.6, which provides for vicarious liability for the public entity." (FAC ¶ 78.)

[21] The wrongful death claims against Toribio and Ramirez arising from the 6:00 a.m. safety check proceed. *See supra* note 9.

the Day-Shift Checks. The claim also proceeds against the County, which Plaintiffs sue on the section 845.6 theory alone, (FAC ¶ 78), to the extent that theory survives.

**H. Damages**

**1. Pre-Death Pain and Suffering**

Sarabia's estate "seeks compensatory damages for the harm Sarabia suffered before his death, including pain and suffering." (FAC ¶ 84.) Defendants argue that "there is no evidence" of pre-death pain and suffering because "Sarabia died in his sleep, and it is uncontested that there was no trauma to Sarabia's body." (MSJ 40.)

To "recover for the decedent's predeath pain and suffering, the beneficiary must show 'that the decedent was conscious for at least some period of time after he suffered the injuries which resulted in his death.'" *Ghotra ex rel. Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1061 (9th Cir. 1997) (quoting *F/V Carolyn Jean, Inc. v. Schmitt*, 73 F.3d 884, 885 (9th Cir. 1995)). If "a decedent remains conscious for an 'appreciable period of time' after his injury, a jury can properly return an award based on the decedent's pain and suffering," and "[w]hat constitutes an 'appreciable period of time' will vary, depending on the circumstances of each case." *Cook v. Ross Island Sand & Gravel Co.*, 626 F.2d 746, 751 (9th Cir. 1980). In *Cook*, the court upheld an award for two and one-half minutes of consciousness, a "period of heightened awareness" that distinguished the case from "violent deaths that resulted from sudden and severe physical injuries." *Id.* at 751–52.

Sarabia's death was not violent, and, viewing the evidence in the light most favorable to Plaintiffs, nor was it sudden. On Plaintiffs' evidence, he died of heart failure that progressed over several hours, and his symptoms were "more likely than not" continuous during that time. (Robin Rpt. 4; Minns Rpt. 4; *see supra* Sections I.A, I.D.) Defendants' experts, by contrast, opine that Sarabia suffered a sudden cardiac death that occurred "without warning and without antecedent symptoms." (Defs.' Ex. A 6; *see* Defs.' Ex. AU ¶ 15.) These competing accounts present a genuine dispute about whether, and for how long, Sarabia was conscious and suffering before he died. That dispute is for the jury. *See Cook*, 626 F.2d at 751 (noting that the Supreme Court "has placed the question of a

decedent's consciousness squarely within the province of the jury"). Accordingly, the Motion for Summary Judgment on damages for pain and suffering is **DENIED**.

**2. Punitive Damages**

Plaintiffs seek punitive damages on the deliberate indifference, familial association, and negligence claims. (FAC ¶¶ 61, 70, 85.) Both federal claims arise under § 1983, so the same standard governs them. "It is well established that a 'jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.'" *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir. 1993) (quoting *Davis v. Mason Cnty.*, 927 F.2d 1473, 1485 (9th Cir. 1991)); *see Smith v. Wade*, 461 U.S. 30, 56 (1983). Conduct is in reckless disregard of a plaintiff's rights "if, under the circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (quoting Model Civ. Jury Instr. 9th Cir. 7.5 (2004)). "[M]alicious, wanton, or oppressive acts or omissions" are also "proper predicates for punitive damages under § 1983." *Id.* An act is oppressive if it violates another's rights "with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking advantage of some weakness or disability or the misfortunes of another person." *Id.* at 809 (quoting *Fountila v. Carter*, 571 F.2d 487, 493 (9th Cir. 1978)).

Under California law, which governs the negligence claim, punitive damages require clear and convincing evidence that the defendant acted with "oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Malice includes "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). Whether a defendant acted with the requisite state of mind is ordinarily a question for the jury. *See Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985).

Under the federal standard, which governs the deliberate indifference and familial association claims, a jury could find the following as to the Knuckle Check Defendants:

despite repeated requests from Sarabia and Gonzalez for medical care, Herrera said, "Shut the fuck up. Get back in your rack." (Gonzalez Dep. 32, 40–41.) Zelt heard an inmate say that Sarabia was "not feeling well," and more than one deputy, "perhaps including" Zelt, told Sarabia to go back to his rack. (Zelt Interrog. Resp. Nos. 6, 9; Zelt Dep. 19:3–20:5.) And the deputy Herrera identified as Romanos left without summoning care after Sarabia said he needed to go to medical. (Defs.' Ex. U 85–86; Gonzalez Dep. 32, 50.) As to the Safety Check Defendants, a jury could likewise find that passing through a Dorm of thirty-four detainees in twenty-two to thirty-nine seconds, despite the Safety Check Policy's requirement that they observe each detainee for signs of medical distress, reflects "complete indifference to the plaintiff's safety." *Dang*, 422 F.3d at 807. Under § 3294, a reasonable jury could find for the same reasons, by clear and convincing evidence, that the Knuckle Check Defendants and the Safety Check Defendants acted with "willful and conscious disregard" of Sarabia's safety. Cal. Civ. Code § 3294(c)(1).

The Medication Pass claims stand differently. Toribio and Ramirez are entitled to summary judgment on every claim arising from the Medication Pass, so no punitive damages can rest on that conduct. Only state law claims survive against Navarro, so California's standard governs. But Plaintiffs concede that she knew nothing of Sarabia's earlier requests for care, (Opp'n 30), and nothing in the record shows that she perceived any symptoms when she recorded his refusal. A jury could find that her failure to follow the Refusal Policy was negligent, but no reasonable jury could find by clear and convincing evidence that it was "despicable conduct" carried on "with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). Finally, the County cannot be liable for punitive damages on either the federal or state claims. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); Cal. Gov't Code § 818.

Accordingly, the Motion for Summary Judgment on punitive damages is **DENIED** as to the Knuckle Check Defendants and the Safety Check Defendants, and **GRANTED** as to the County and to the Medication Pass Defendants to the extent punitive damages rest on the Medication Pass.

**I. Daubert Motions**

The Court does not rely on the challenged opinions of Johnnie Lambert or Gary Raney in resolving the Motion for Summary Judgment. Accordingly, Defendants' Motions to Exclude, (ECF Nos. 93, 95), are **DENIED** without prejudice to renewal as motions in limine.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The motion is **DENIED** as to Herrera, Zelt, and Romanos on all claims arising from the Knuckle Check, including Plaintiffs' request for punitive damages.

2. The motion is **GRANTED** as to Navarro, Toribio, and Ramirez on the deliberate indifference, familial association, and Bane Act claims arising from the Medication Pass, and as to Toribio and Ramirez on all other claims arising from the Medication Pass. The motion is **DENIED** as to Navarro on the section 845.6 and negligence claims, and on the wrongful death claim to the extent it rests on those theories. The motion is **GRANTED** as to punitive damages against Navarro.

3. The motion is **DENIED** as to LaBranche, Mazzola, and Boorman on all claims arising from the Day-Shift Checks, including Plaintiffs' request for punitive damages, and **GRANTED** as to LaBranche and Mazzola on all claims arising from the Final Check.

4. The motion is **GRANTED** as to Garcia on all claims arising from the Knuckle Check. The claims against Garcia, Toribio, and Ramirez arising from the 5:30 and 6:00 a.m. safety checks proceed.

5. The motion is **GRANTED** as to punitive damages against the County. The Bane Act, section 845.6, and wrongful death claims proceed against the County to the extent they proceed against the individual Defendants.

6. The motion is **DENIED** as to damages for Sarabia's pre-death pain and suffering.

7. Deputy Rodriguez is **DISMISSED**.

Defendants' Motions to Exclude, (ECF Nos. 93, 95), are **DENIED** without prejudice to renewal as motions in limine.

**IT IS SO ORDERED.**

Dated: November 12, 2026

Hon. Dana M. Sabraw
United States District Judge